IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:09-CV-217-FL

| | |
|---|---|
| HARRELL AND OWENS FARM, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FEDERAL CROP INSURANCE )<br>CORPORATION, a corporation within )<br>the United States Department of )<br>Agriculture; UNTIED STATES )<br>DEPARTMENT OF AGRICULTURE, )<br>RISK MANAGEMENT AGENCY; )<br>ACE PROPERTY AND CASUALTY )<br>INSURANCE COMPANY; and, RAIN )<br>AND HAIL, LLC, )<br>)<br>Defendants. ) | ORDER |

This matter comes before the court on plaintiff's petition for judicial review of the final agency action of defendants Federal Crop Insurance Corporation ("FCIC") and United States Department of Agriculture, Risk Management Agency ("RMA") (collectively, "the Agency"). The issues raised have been fully briefed, and the petition is now ripe for adjudication. For the reasons that follow, the court upholds the final agency action at issue.

## BACKGROUND

Plaintiff Harrell and Owens Farms is a partnership engaged in the farming business in Edgecombe County, North Carolina. In 2005, plaintiff began participating in a sweet potato pilot crop insurance program administered by the Agency under the Federal Crop Insurance Act ("FCIA"),

7 U.S.C. § 1501 et seq. Pursuant to the pilot program, plaintiff purchased insurance coverage for its sweet potato crop in 2006 from defendant ACE Property and Casualty Insurance Company ("ACE Insurance"). The policy was reinsured by the Agency.[1]

On February 1, 2007, plaintiff submitted a demand for arbitration of a dispute arising out of ACE Insurance's adjustment of plaintiff's claim of indemnity for losses to plaintiff's sweet potato crop of 2006.[2] In the arbitration proceedings, plaintiff and ACE Insurance disagreed as to the interpretation of the provision of the policy governing how loss was to be calculated. Plaintiff contended that its loss should be measured on the basis of actual harvested production of sweet potatoes in 2006. ACE Insurance, relying on the Agency's Sweetpotato New Pilot Loss Adjustment Standards Handbook ("the Handbook"), contended that loss should be measured on the basis of the greater of actual harvested production or a pre-harvest appraisal of sweet potato production.

Plaintiff argued that the Handbook conflicted with the terms of the policy ("the Pilot Provisions"), which are set forth by the FCIC as part of the sweet potato pilot insurance program,

---

[1] "The FCIC is a wholly owned government corporation that operates under the umbrella of the Department of Agriculture..., and it is statutorily responsible for regulating the crop insurance industry. The FCIC is itself regulated by the [RMA, another agency with the Department of Agriculture]. As specified by Congress, the FCIC's purpose is 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.' 7 U.S.C. § 1502(a). The crop insurance program implements the public policy of protecting farmers from the risks associated with drought, flood, and other natural disasters." In re Peanut Crop Ins. Lit., 524 F.3d 458, 462 (4th Cir. 2008) (some internal citations omitted).

FCIC operates a general crop insurance program pursuant to the FCIA. See 7 U.S.C. § 1508; 7 C.F.R. § 457.1 et seq. The FCIC also has the authority under the FCIA to conduct one or more "pilot program[s]... to evaluate whether a proposal or new risk management tool tested by the pilot program is suitable for the marketplace and addresses the needs of produces of agricultural commodities." 7 U.S.C. § 1523(a)(1). The scope of a pilot program may be limited to a specific region or state, and operates for only four years unless extended. Id. § 1523(a)(4). The sweet potato pilot insurance program at issue here was terminated effective this year. See RMA, Termination of the Sweetpotato Pilot Crop Insurance Program, Bulletin No. MGR-09-008 (Oct. 13, 2009), http://www.rma.usda.gov/bulletins/managers/2009/mgr-09-008.pdf (last visited Oct. 1, 2010).

[2] Plaintiff is also engaged in a dispute with ACE Insurance with respect to its 2008 crop under the same pilot program. The 2008 matter is not properly before the court at this time, as there is no allegation of any agency action that has been taken with respect to the 2008 policy.

2

and that the Pilot Provisions must control in such situations. Plaintiff further contended that, even assuming the appraisal number could be used, ACE Insurance had incorrectly performed the appraisal by not considering root quality in performing its count. The parties agree that the interpretation of the Pilot Provisions and the Handbook greatly affect the loss calculated and, as such, the amount plaintiff will receive in indemnification from ACE Insurance.

Under standard provisions promulgated by the Agency ("the Basic Provisions" or "the Basic Policy") regarding all crop insurance policies, any dispute between an insurer and the insured involving the application or meaning of a policy provision must be submitted to the Agency for interpretation. The Agency's interpretation of the policy provision is then binding in the arbitration proceeding. Accordingly, plaintiff and ACE Insurance jointly submitted their dispute to the Agency on September 20, 2007. The Agency provided its interpretation of the Pilot Provisions on December 17, 2007. This initial interpretation was favorable to ACE Insurance. On January 16, 2008, plaintiff submitted a request for reconsideration or clarification. In response, the Agency issued a second interpretation on April 7, 2008, which again favored ACE Insurance.

Plaintiff timely appealed the adverse agency decision to the National Appeals Division of the Department of Agriculture. A hearing was conducted on July 15, 2008, at which testimony, argument from counsel, and evidence were received. The hearing officer issued her appeal determination on August 21, 2008, upholding the Agency's interpretation of the Pilot Provisions. On September 24, 2008, plaintiff further appealed to the Director of the National Appeals Division. By written opinion issued December 30, 2008, the Director upheld in part and reversed in part the hearing officer's decision. The Director's decision represents the final administrative action available to plaintiff with respect to the interpretation of the policy.

3

Following issuance of the Agency's conclusive interpretation of the relevant policy provisions, the arbitrator reconvened the arbitration hearing on November 2, 2009. The resulting arbitration award, issued November 19, 2009, was favorable to ACE Insurance. The arbitrator found that plaintiff was entitled only to that sum already paid by ACE Insurance as indemnification. The administrative fees were ordered to be split equally between plaintiff and ACE Insurance.

On December 23, 2009, plaintiff filed this action challenging both the interpretation of the Pilot Provisions and the arbitration award. Plaintiff's action necessarily then is bifurcated into two separate inquiries. The instant order addresses only the first inquiry, respecting plaintiff's petition for judicial review of the final agency action as against the Agency. Plaintiff filed its memorandum in support of judicial review on July 5, 2010. The Agency filed a memorandum in opposition on August 6, 2010. Plaintiff replied August 20, 2010.[3]

## THE FINAL AGENCY ACTION

The Director of the National Appeals Division's written opinion, which constitutes the final agency action in this matter, is provided in relevant part as follows:

> [I]f there is a conflict between the various policy provisions, the order of priority is: 1) The Catastrophic Risk Protection Endorsement, as applicable; 2) the Special Provisions for sweet potatoes; 3) the Pilot Provisions; and 4) the Basic Provisions. At issue here are only the Pilot Provisions and the Basic Policy. The Basic Policy states that the FCIC and approved insurance providers administer the policy and corresponding regulations through the use of FCIC-issued procedural handbooks such as [the Handbook]. If there is a conflict between the [FCIA], the regulations and the procedures issued by FCIC, the order of priority is: 1) The [FCIA]; 2) the regulations; and 3) the procedures issued by FCIC. Consequently, if FCIC issued

---

[3] The second inquiry involves plaintiff's motion to vacate the arbitration award (DE # 4) as against defendants ACE Insurance and Rain and Hail, LLC. This separate motion remains pending and, in accordance with the case management order entered May 19, 2010, the parties are directed to submit a supplemental joint report and plan setting forth proposed deadlines for discovery, if any, and proposed deadlines for briefing on the motion to vacate.

procedures such as the [Handbook] conflict with the regulations, the regulations take precedence . . . .

The [Handbook] at Section 7(B) advises that if check strips are left after a claim of loss is made, production to count for any harvested acreage will always be the greater of the appraisal or the total of all the harvested sweet potatoes based upon the production records. Consistent with this procedure, the Pilot Provisions state that in the event of covered damage or loss to sweet potatoes, the insurance company will perform an appraisal of production of any damaged sweet potatoes provided the potatoes have achieved maturity. In order to settle a claim, the insurance company will consider several factors, including the producer's total production. Paragraph 12(c)[] of the Pilot Provisions states that production or production to count includes: "(1) All appraised production as follows . . ., (2) All harvested production, and (3) In the event that you have reported uninsured acres due to planting in excess of the number permitted to be insured . . ., multiplying the sum of the harvested and appraised production by the ratio of the insured acres to the total acres planted."

[Plaintiff] has argued at length that there is no evidence to establish it falls within the numbered circumstances described in Paragraph 12(c)(1) . . . . [Plaintiff] argues that because it does not fall within one of the exclusive numbered circumstances related to Paragraph 12(c)(1)'s explanation of appraised production to be included in production to count, [ACE Insurance] is barred from considering appraised production in its determination of [plaintiff's] production to count. Specifically, [plaintiff] argues that . . . only Paragraph 12(c)(2), stating that harvested production is included in the calculation of production to count, applies to its claim. I do not agree with [this] interpretation of the provision.

A plain language reading of Paragraph 12(c) demonstrates that this part of the Pilot Provisions conveys that production to count will include appraised production, harvested production, and a combination of the two calculations in circumstances involving uninsured reported acreage. Paragraph 12(c)(1) expounds upon the term "appraised production" to demonstrate that it will not be less than the production guarantee in certain circumstances, and will be used instead of harvested production in certain other specified circumstances. The provision does not state that appraised production will be used only if one of those specified circumstances expressly provides for its use. Thus, Paragraph 12(c) provides an insurance company with three options to utilize in determining the appropriate production to count for a particular claim of loss. The options are inclusive – they are not exclusive – and the provision can reasonably be read to allow an insurance company to use the options interchangeably, depending upon the specific circumstances of the claim of loss at issue and other applicable policy provisions. Section 7(B) of the [Handbook] simply explains that in implementing this portion of the Pilot Provisions, an insurance company adjuster must use the greater of the options in all instances in which check

5

strips are left and it is possible to conduct an appraisal. Therefore, I find that RMA did not err in concluding that the Handbook language does not conflict with Paragraph 12(c) of the Pilot Provisions, but instead provides an insurance company with a reasonable interpretation of the manner in which it is to be implemented. Consequently, I find no error in RMA's conclusion that the [Handbook] procedures are properly applicable to the adjustment of [plaintiff's] claim of loss as they relate to the Pilot Provisions.

Despite the above, I find that Section 7(B) of the [Handbook] does conflict with Paragraph 15(b) of the Basic Policy. . . . [Paragraph 15(b) states in relevant part that] "[a]ppraised production will be used to calculate a claim if the producer is not going to harvest his acreage. Such appraisals may be conducted after the end of the insurance period. If the producer harvests the crop after the crop has been appraised . . . [and] the harvested production is less than the appraised production, and: (i) The producer harvested after the end of the insurance period, the appraised production will be used to adjust the loss, unless the producer can prove that no additional causes of loss occurred after the end of the insurance period; or if (ii) The producer harvested before the end of the insurance period, the harvested production will be used to adjust the loss."

. . . . A plain reading of Paragraph 15(b) makes it clear the Basic Policy contemplates that in cases where a producer harvests the crop after the crop has been appraised (as long as the producer can provide the insurance company with records establishing the amount of harvested production), there are circumstances in which harvested production even if it is lower than appraised production must be used to determine production to count for purposes of adjusting the loss. Yet, as [plaintiff] notes, Section 7(B) of the [Handbook] excludes such circumstances, stating that production to count for any harvested acreage be the greater of the appraisal or the total of all the harvested sweet potatoes in all circumstances in which check strips are left for purposes of conducting the appraisal. Thus, the [Handbook] language at Section 7(B) directly conflicts with the language found at Paragraph 15(b) of the Basic Policy. . . . Accordingly, if the arbitrator were to find that the factual circumstances of [plaintiff's] case fit within the parameters of Paragraph 15(b) of the Basic Policy, the arbitrator and indeed, [ACE Insurance], would be obligated to apply the language of 15(b) without reference to the conflicting provisions in Section 7(B) of the [Handbook].

\* \* \* \*

Turning to [plaintiff's] final claim, I conclude that Section 7(A) of the [Handbook] does not conflict with the portions of the Pilot Provisions which dictate the proper method of evaluating the potatoes to be included in production to count. As [plaintiff] notes, Section 7(A) of the [Handbook] advises adjusters to determine

6

production to count based upon field-pack production, which is based upon a grade (size) inspection of the roots from sample plants in the location of check strips left for purposes of appraisal. Specifically, the [Handbook] states that adjusters should include all potatoes that are more than 1.5 inches in diameter in production to count. Section 7(A)(2)(b) further specifies that quality of the roots is not assessed by the grade (size) inspection.

However, the Pilot Provisions provide that insurance is provided against certain specified causes of loss that occur during the insurance period, including adverse weather conditions, as well as insects and plant disease, provided that adverse weather conditions prevented application of control measures. The Provisions expressly exclude coverage for damage or loss of production that occurs due to inability to market the production because it is damaged as defined in the Standards, unless such damage is the direct consequence of an insured cause of loss specified in the Pilot Provisions. The Standards . . . define damage as defects that materially or seriously detract from the appearance, or edible or shipping quality, of the individual sweet potato, or the lot as a whole; or which cannot be removed without a loss of more than a specified percentage of the total weight of the sweet potato. Damage includes unhealed growth cracks and soil rot that seriously detract from the appearance of the individual sweet potato.

Based upon the above, [plaintiff] contends the [Handbook], which requires all sweet potatoes that are at least 1.5 inches in diameter be included in production to count, irrespective of the quality of the potatoes, directly conflicts with Paragraph 10 of the Pilot Provisions. Specifically, [plaintiff] argues it should be allowed to arbitrate its claim that it could not sell many of the sweet potatoes [ACE Insurance] included in its production to count for purposes of the appraisal because they had been damaged by rot and insect infestation as a result of excessive moisture, a covered cause of loss. I am not persuaded by [plaintiff's] claim that Section 7(A) of the [Handbook] and Paragraph 10 of the Pilot Provisions conflict. Although Paragraph 10 of the Pilot Provisions refers to the Standards, which seemingly define damage in terms of quality as opposed to simply the size of the potato, other portions of the Pilot Provisions make it clear that the policy limits coverage to considerations of the size of the potato. Specifically, the Pilot Provisions define production to count in terms of field pack production. The Provisions state that "field-pack production" is:

> The quantity of tuberous sweet potato roots harvested, or that could have been harvested, that are at least one and one-half inches in diameter. <u>With respect to the Standards, field-pack production consists of all tuberous roots that could be classified as U.S. Extra No. 1, U.S. No. 1, or U.S. No .2 solely on the basis of length, diameter, and weight as those terms are defined in the Standards.</u>

7

(emphasis added). Thus, the Pilot Provisions themselves limit any consideration of the Standards, in terms of the definition of field pack production to be included in production to count, to "solely" the size and weight of the potato as those terms are defined in the Standards. The Provisions do not include considerations of quality in the determination of production to count. On this basis, I conclude that RMA did not err in finding that the [Handbook] interpretation is reasonable and does not conflict with the description of production to count as identified in the Pilot Provisions. For this reason, I find no error in RMA's conclusion that the [Handbook] procedures, relating to evaluation of the potatoes, are properly applicable to the adjustment of [plaintiff's] claim of loss.

(Compl. Ex. A (internal citations omitted).)

## DISCUSSION

A.  Standard of Review

This court has jurisdiction to review a final determination of the Agency under 7 U.S.C. § 6999 and 7 C.F.R. § 11.13. See, e.g., Tyson v. U.S. Dep't of Agric., 360 F. App'x 451, 454 (4th Cir. 2010) (per curiam) (unpublished). The court's review of the Agency's determination is undertaken in accordance with the Administrative Procedures Act ("APA"). 7 U.S.C. § 6999. Under the APA, the court must "decide all relevant questions of law" and "hold unlawful and set aside any agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The parties vigorously dispute the standard of review dictated by the APA in this case. Plaintiff notes that the court must "undertake a *de novo* review of either legal questions or the application of law to the facts when resolution of those issues is regularly undertaken by courts of general jurisdiction." Melton v. Pasqua, 339 F.3d 222, 224 (4th Cir. 2003). As a general matter, an agency's interpretation of a written contract is subject to *de novo* review because interpretation of a contract is a legal question within the core competency of the courts. See Burgin v. Office of Pers.

8

Mgmt., 120 F.3d 494, 497-98 (4th Cir. 1997) (reviewing *de novo* an agency's interpretation of health benefits plan). But see Caudill v. Blue Cross & Blue Shield of N.C., 999 F.2d 74 (4th Cir. 1993) (reviewing under "plainly erroneous" standard the same agency's interpretation of a health benefits plan), abrogated on other grounds by Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677 (2006); Myers v. United States, 767 F.2d 1072, 1074 (4th Cir. 1985) (same).

The Agency, on the other hand, urges the court to adopt a more deferential standard of review. The Agency contends that its interpretation of the Basic Provisions, the Pilot Provisions and the Handbook is akin to the interpretation of agency regulations. The Agency notes that this court must allow "substantial deference when reviewing an agency's interpretation of its own regulations . . . [and] must defer to the [agency's] interpretation . . . unless it is plainly erroneous or inconsistent with the regulation." Sigma-Tau Pharms., Inc. v. Schwetz, 288 F.3d 141, 146 (4th Cir. 2002) (internal quotation marks omitted). "This broad deference is [particularly] warranted when . . . the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks and citations omitted).

Caudill and Burgin are instructive here. Both cases involved the interpretation of a federal employee's health plan by the Office of Personnel Management ("OPM"). In Caudill, the Fourth Circuit noted that "Congress delegated to OPM the authority to decide the benefits and exclusions in [insurance] plans [governed by the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901 et seq.] and to negotiate and contract for any benefits, maximums, limitation and exclusions 'it considers necessary or desirable.'" 999 F.2d at 77 (quoting 5 U.S.C. § 8902(d)). OPM set up an

9

administrative remedy procedure for reviewing denied claims and determining whether benefits were owed under the contract. Id. The Fourth Circuit adopted the "arbitrary and capricious" standard urged by the Agency here, noting that "[b]enefit provisions are rules under the [APA]" and that the district court was obliged to defer to OPM's determination of those privisions "unless plainly erroneous or inconsistent with the regulation." Id. at 80 (internal quotation marks omitted).

In Burgin, the Fourth Circuit was again asked to review OPM's interpretation of a federal employee's health benefit plan. The court noted that it was required to "show substantial deference to an agency's interpretation of its own regulations, relying on the agency's unique expertise and policymaking prerogatives." 120 F.3d at 497 (internal quotation marks and citations omitted). However, the court declined to show such deference where the agency's interpretation was "not based on expertise in the particular field, . . . but [was] based on general common law principles [governing contract construction]." Id. Thus, the court suggested that while it would defer when "the dispute is . . . to be resolved by reference to the regulatory provisions governing the features of an acceptable contract," it would not defer to a dispute where "the essential question is one of the interpretation of the contract's language." Id. at 497-98. Interestingly, despite reviewing the matter *de novo*, the Fourth Circuit ultimately rejected OPM's interpretation of the health plan because that interpretation was "clearly irrational," "violative of norms of contract construction and otherwise arbitrary," and "not . . . reasonable." Id. at 498-99.

These cases are difficult to reconcile with one another, but the court need not resolve any conflict in the cases. Cf. Malek v. Leavitt, 437 F. Supp. 2d 517, 528 (D. Md. 2006) (declining to "resolve any conflict that may exist between Caudill . . . and Burgin"). There is sufficient common teaching in the cases to provide a framework for the court to decide the instant matter. Specifically,

the cases agree that where the agency's interpretation turns on reference to rules and regulatory provisions, is made pursuant to a comprehensive statutory scheme, and is based on specific policymaking prerogatives and subject-specific expertise, the court is to afford the agency substantial deference. By contrast, where the agency's determination was made simply by reference to general common law principles governing contracts, no such deference is given.

Here, the Agency's determination is more accurately described as being based on specific policymaking prerogatives and turning on rules and regulations adopted pursuant to a comprehensive statutory and regulatory scheme. The challenged determination turned on the Agency's interpretation of the statute setting forth the crop insurance program, the general regulatory provisions codified in the Code of Federal Regulations governing all crop insurance contracts, the specific regulatory provisions governing the sweet potato pilot crop insurance program,[4] and specific claims-adjustment procedures also promulgated by the Agency. (See Compl. Ex. A at 10 (noting that the Agency's role is to determine whether "a conflict [exists] between the [FCIA], the regulations[,] and the procedures issued by FCIC").) The Agency did not use general common law principles of contract construction in making its decision, but instead synthesized a broad regulatory scheme that "ensure[s] that all claims for loss are adjusted, to the extent practicable, in a uniform and timely manner." See 7 U.S.C. § 1508(j)(1).

Based on the principles set forth in Caudill and Burgin, the Agency's interpretations of the Handbook, the Pilot Provisions, and the Basic Provisions are entitled to substantial deference. The

---

[4] Although these provisions were not codified in the Code of Federal Regulations, they would have been had the sweet potato pilot crop insurance program been successful. See 7 C.F.R. §§ 457.101-.173 (codification of provisions for other specific crop insurance programs); see also United States v. Mead, 533 U.S. 218, 230-31 (2001) (finding specific notice-and-comment requirements not to be determinative of whether deference is to be given to an agency's rules and regulations, as long as Congress "provide[d] for a relatively formal administrative procedure tending to foster ... fairness and deliberation").

11

Agency's determination based on these materials will not be set aside "unless it is plainly erroneous or inconsistent with the regulation[s]" at issue. See Sigma-Tau Pharms., 288 F.3d at 146; Caudill, 999 F.2d at 77.

B.  Analysis

The Agency made three distinct determinations relevant to plaintiff's petition for judgment. First, the Agency found no conflict as between Section 7(B) of the Handbook and Paragraph 12(c) of the Pilot Provisions. The Agency found that Paragraph 12(c) of the Pilot Provisions provides an insurance company with three inclusive, not exclusive, means for measuring production to count, and that Paragraph 12(c)(1), which expounds upon the phrase "appraised production," does not by its own terms require that appraised production be used only if one of the listed factors is present. The Agency stated that Paragraph 12(c) could be read to allow an insurance company to use the three options interchangeably, depending upon the specific circumstances of the claim of loss at issue and other applicable policy provisions. Section 7(B) of the Handbook, according to the Agency, simply directs an insurance company to use the greater of the options in one particular instance: where check strips are left and it is possible to conduct an appraisal.

Second, the Agency found that the same requirement in Section 7(B) of the Handbook that an insurance company use the greater of harvested production or appraised production directly conflicted with the Paragraph 15(b) of the Basic Policy. The Agency stated that the plain language of Paragraph 15(b) of the Basic Policy requires that, in certain situations, harvested production must be used in measuring production to count even if harvested production is lower than appraised production. Specifically, harvested production must be used if (1) the producer harvests the crop after it has been appraised and (2) the producer provides the insurance company with records

12

establishing the amount of harvested production. The Agency declined to make any factual finding about whether Paragraph 15(b) applied to plaintiff's claim, however, leaving that determination for the arbitrator.

Finally, the Agency determined that there was no conflict between Section 7(A) of the Handbook and Paragraph 10 of the Pilot Provisions. The Agency noted that the Handbook requires all sweet potatoes that are more than 1.5 inches in diameter to be included in production to count, regardless of quality. By contrast, the Pilot Provisions exclude coverage for damage or loss of production that occurs due to inability to market the production because it is damaged as defined in the Standards (that is, the Department of Agriculture's Standards for Grades of Sweetpotatoes), unless such damage is the direct consequence of an insured cause of loss specified in the Pilot Provisions. "Damage" is defined in the Standards in part to include defects that materially or seriously detract from the appearance, or edible or shipping quality, of the individual sweet potato or the lot as a whole. Although these provisions are apparently conflicting, the Agency also noted that other portions of the Pilot Provisions – specifically the definition of field-pack production – indicate that coverage is limited based solely on considerations of the size of the sweet potato. Construing the Pilot Provisions as a whole, rather than focusing on the individual paragraph challenged, the Agency found that the Handbook was consistent with a coherent scheme allowing the counting of all sweet potatoes of a certain size in appraising production to count.

The Agency clearly articulated the reasons behind each of these determinations, taking into account the sweet potato pilot crop insurance program as a whole and construing the rules and regulations governing that program accordingly. In construing Section 7(B) of the Handbook against both the Pilot Provisions and the Basic Policy, the Agency rationally implemented a program that

allows an insurer to take into account the greater of harvested or appraised production unless the producer harvested the crop after it had been appraised and could provide the insurer with records establishing the amount of harvested production. In allowing sweet potatoes over a certain size to be counted, the Agency relied on a definition provided in the Pilot Provisions themselves, rather than the narrow exclusion proposed by plaintiff.

The court cannot say that the Agency's determination was "clearly irrational" or "arbitrary." Burgin, 120 F.3d at 498-99. Morever, "even if the court would have come to a different conclusion, it must not substitute its judgment for that of [the Agency]." See Caudill, 999 F.2d at 80. As such, the final agency determination is upheld over plaintiff's challenge.

## CONCLUSION

For the foregoing reasons, the court concludes that the interpretation of the sweet potato pilot crop insurance program's rule and regulations offered by the FCIC and RMA was not plainly erroneous or inconsistent with the regulations. Accordingly, the final agency action of these defendants is upheld against plaintiff's challenge, and will not be set aside.

Consistent with the case management entered in this case, the parties have twenty-one (21) days from date of entry of this order within which to submit a supplemental joint report and plan in furtherance of the parties' May 12, 2010, proposal that after the court's decision on the petition for judicial review, they revisit the range of issues remaining in dispute and make report to the court.

SO ORDERED, this the 5th day of October, 2010.

_____
LOUISE W. FLANAGAN
Chief United States District Court Judge